UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ) | |
| UNITED STATES ) | |
| ) | |
| v. ) | Criminal No. 19-10466-LTS |
| ) | |
| ISMAEL JIMENEZ, ) | |
| ) | |
| Defendant. ) | |
| ) | |

MEMORANDUM AND ORDER ON MOTION TO SUPPRESS (DOC. NO. 86)

July 22, 2026

SOROKIN, J.

Ismael Jimenez is charged with three firearms offenses in this case, stemming from

evidence found during a search of his home conducted pursuant to a warrant.  He asks the Court

to suppress the evidence seized during that search.  Doc. No. 86.  The government has opposed

his motion, Doc. No. 94, and Jimenez has replied, Doc. No. 96.  For reasons the Court will

explain, Jimenez's motion is DENIED.

I.    BACKGROUND

The Court recounts the facts based on the materials submitted by the parties in support of,

and opposition to, Jimenez's motion.  Doc. Nos. 86-1 to -17, 94-1 to -2.  The motion papers

include the search warrant and its supporting documents; photographs, diagrams, and a video

walkthrough of the home; reports summarizing interviews of three people present at the time of

the search; and other reports describing how the warrant was executed.  Because these materials

adequately depict the layout of the relevant building and describe the warrant's execution, the

Court finds that no evidentiary hearing is necessary.  See Doc. No. 86 at 12 (seeking hearing

only if "there is any question" requiring investigator testimony concerning layout or agent testimony concerning execution of warrant).[1]

###### A.   The Building

Jimenez lives with various members of his family in a building located in Lawrence, Massachusetts, at 21-23 Nesmith Street.  The building is relatively large.  It rises three stories, has enclosed front porches on the first and second floors, includes a covered (but not fully enclosed) porch on the left side, and features at least one exterior door on each side of the first floor.  See Doc. Nos. 86-12, -16.  Concrete stairs lead from the front sidewalk to a screened door at the side of the first-floor front porch.  Id.  The exterior of the porch displays the house numbers "23" and "21."  Doc. No. 86-1 at 4.  Inside the first-floor front porch, two doors lead into the main building: The door on the left bears the number "23"; the right, "21."  Doc. No. 86-1 at 5.  Both doors have locks.  See Doc. No. 86-1 at 5.  They provide separate entrances to the two units that comprise the building.  Though not apparent from the outside, the building is divided inside as follows: 23 Nesmith Street consists of the second and third floors, while 21 Nesmith Street includes the first floor and the basement.  See Doc. No. 86-14 at 44–46.  The entire building is owned by Jimenez's brother, who lives on the third floor.  See id. at 18.  His mother, the previous owner, sold it to him.  Id.

Affixed to the window of the door labelled "21" is an index card marked "Family Jimenez."  See Doc. No. 86-1 at 3, 5.  That door opens into a small vestibule, where a second locked door leads into a living room which occupies the front, right corner of the building's first

---

[1] Jimenez has not filed declarations or described proposed testimony regarding either of these issues at all, let alone anything that would materially diverge from or supplement the information in the record.  He also has not disputed the facts recounted in the affidavit supporting the application for the search warrant.

floor.[2]  Beside the living room, accessed via a door off that room, a bedroom occupied by

Jimenez's grandparents takes up the front, left corner of the first floor.  An open door on the

living room's rear wall leads into a den.  The kitchen is located behind the grandparents'

bedroom, accessible via interior doors from the living room and the den, as well as an exterior

door leading in from building's side porch.  Behind the kitchen, moving toward the rear of the

building's first floor, is a short hallway with a bathroom on the left side and a small bedroom at

the end, where Jimenez's uncle was staying at the time of the search.  Behind the den, in the

right, rear corner of the first floor, is a bedroom occupied by Jimenez's parents.

A door on the right-side wall of the den leads to an interior hallway along the rear half of

the right side of the house.  The door from the den to that hallway has a deadbolt lock on it.  At

the front of the hallway is a door leading outside to a staircase along the driveway.  That door has

a lock on its knob, but no deadbolt.  Just inside that door, in the hallway across from the door to

the den, are a washer and dryer.  The hallway wall opposite those appliances is decorated with a

mirror and three picture frames.  Beyond the washer and dryer, a locked door on the right wall of

the hallway leads to a staircase that leads to 23 Nesmith Street, which is accessed from the

staircase via another "lockable exterior door."  Doc. No. 94-1 at 5.  Back on the first floor, the

hallway ends with a short set of stairs to a landing, where another door leads outside at the rear

of the building.  That door has two knobs, one of which contains a visible lock.  From the

landing, a second set of steps descends back toward the front of the house and leads to the

basement.

---

[2] The Court's description of the layout of 21 Nesmith Street relies primarily on diagrams, Doc. No. 86-16, and a twelve-minute walkthrough video taken by an agent involved in executing the search warrant, Doc. No. 86-15.

Only the rear portion of the basement is finished.  Another washer and dryer are located at the bottom of the steps.  A hallway leads from those appliances to the right, across the back of the building, with a vertical support column positioned in the center of the hallway.  Just beyond the column and to the left is a small bathroom, with a sink, toilet, and shower.  On the right side of the hallway, occupying the rear portion of the basement, is Jimenez's room.  It is arranged in a manner suggesting two distinct areas within the larger space, though the areas are not partitioned with a door or any other physical divider.  One half contains a small couch, a desk and chair, a television, a mini-fridge, and a closet.  The other half contains a bed, terrarium, dresser, space heater, another closet, and another television.  Each half contains a door leading to the basement hallway, and each door includes at least one lock.  The rest of the basement is unfinished storage space accessible by turning left at the end of the hallway running alongside Jimenez's room.

B.    The Investigation

Special Agent ("SA") Matthew J. McCarthy of the United States Department of Homeland Security ("DHS"), assigned to the Boston office of Homeland Security Investigations ("HSI"), prepared the affidavit submitted with the government's search-warrant application in this case.  Doc. No. 86-1 at 7–25.  After describing his responsibilities and experience, SA McCarthy identified relevant federal criminal statutes concerning importing and possessing firearms.  He then summarized the investigation from which the application arose.

On June 3, 2019, DHS learned that a shipment of goods originating in China and bound for the United States included an item described as a "Glock Switch" on the shipment's manifest. Id. at 16.  The manifest identified Jimenez as the recipient, listing 21 Nesmith Street as his address and including a telephone number.  Id. at 16–17.  Phone records confirmed that Jimenez was the subscriber for that number, with a billing address of 21 Nesmith Street.  Id. at 17. Jimenez had no license permitting him to import, manufacture, deal in, collect, or carry firearms.

4

Id. at 17, 20.  In fact, his criminal record precludes him from lawfully possessing them.  Id. at 20.  Though Jimenez's brother has a valid Massachusetts Firearms Identification card, state records revealed he owns two guns that are incompatible with a Glock Switch.  Id. at 17.

A Glock Switch is a device that, "when properly installed on a semi-automatic Glock pistol, will allow the firearm to expel more than one projectile by a single pull of the trigger."  Id. at 15.  Installation "is fast and simple, requires no technical expertise," and serves "the sole purpose of converting semi-automatic Glock pistols into fully automatic machineguns."  Id.  Glock Switches may be lawfully purchased and possessed only by limited categories of people.  Id. at 16.  Jimenez is not within any of those categories.  See id. (stating lawful use is limited to military, law enforcement, and certain federally licensed manufacturers, importers, or dealers of weapons).  DHS's international shipping records showed that Jimenez had ordered two other packages from China in early June 2019 containing firearms-related items: a holster, and a "Glock Stock."  Id. at 18.  The latter is an accessory that can turn a "handgun into a shoulder/chest fired firearm," an alteration often made when converting a Glock pistol into a "rapidly firing" "machine gun."  Id.

The foregoing led SA McCarthy to conclude that Jimenez likely possessed a Glock handgun, and that he likely kept it (and any related parts and accessories) at 21 Nesmith Street, where he lived.  Id. at 18; see id. at 20–22 (describing affiant's experience and basis for believing firearm with related paraphernalia and paperwork would be in owner's home).  Jimenez's driver's license and the registration for his car identified 21 Nesmith Street as his home address, as did his Massachusetts probation records.  Id. at 18–19.  Physical surveillance of that location confirmed that Jimenez's car was parked there on several occasions in early June 2019.  Id. at 19.

On June 10, 2019, the package addressed to Jimenez arrived at JFK International Airport in New York.  Id.  Border officials inspecting it confirmed the recipient information (Jimenez, at 21 Nesmith Street), and "determined that the package contained two Glock switches."  Id. at 19–20.  They photographed the package and its contents, then turned the items over to HSI.  Id. at 20.  Investigators promptly prepared a search-warrant application and submitted it to a United States Magistrate Judge on June 12.  Id. at 7.  The Magistrate Judge issued the warrant that day.  Id. at 1.

> The warrant contained the following description of the premises to be searched:

> 21 Nesmith Street, Lawrence, Massachusetts, a three-family, three-story dwelling (including attic), with vinyl siding, tan/beige in color with white trim and brown shutters.  The numbers "21" and "23" are clearly affixed to the exterior of the first-floor porch.  A photograph of the front of the premises as viewed from Nesmith is attached hereto.  There are two main entrances located side-by-side inside the enclosed first-floor porch.  As viewed from Nesmith Street, the door to the left is brown in color with a window that has the number "23" affixed to it.  The door to the right is also brown in color with a window, but the number "21" is affixed to the window along with an index card bearing the notation "Family Jimenez," and a second piece of paper stating "Family Ramos."  A photograph of the front entrances is attached hereto.

Id. at 3; see id. at 4–5 (photographs of front view and entrances).  A separate attachment to the warrant listed items to be seized, describing them as "evidence, fruits, proceeds, and instrumentalities of violation of 18 U.S.C. § 922(g)(1), possession of a firearm by a felon, and 18 U.S.C. § 545, importation of merchandise into the United States contrary to federal law."  Doc. No. 86-1 at 6.  The list described eight categories of items, including firearms, ammunition, stocks, switches, safes or locked cabinets, and records related to the purchase of firearms or showing indicia of residency.  Id.

C.    The Search

A team of investigators executed the warrant on June 13, 2019.  See id. at 29; Doc. No. 94-1 at 2–8.  First, a U.S. Postal Inspector dressed as a mail carrier "conducted a controlled

6

delivery" of the package containing the Glock Stocks, which had been resealed by investigators. Doc. No. 94-1 at 4. Jimenez's mother answered the door, confirmed that Jimenez lived at 21 Nesmith Street, but said he was not home. Id. She called Jimenez, who spoke by phone with the Postal Inspector; Jimenez confirmed he was expecting a package, said it contained "car parts," and directed the Inspector to leave the package with his mother. Id. at 4–5. The Inspector did so, then left. Id. at 5.

Minutes later, HSI agents executed the warrant. Id. As they approached, a woman exited the building and went to a car parked in the driveway beside the home. Id. at 6. Two agents stopped her in the driveway and learned she lived upstairs, at 23 Nesmith Street, with Jimenez's older brother. Id. She did not have a firearm or the package that had been delivered. Id. She told the agents that Jimenez lived alone in the basement, that she saw him weekly when she went to the basement to do laundry, that he kept his room locked, and that he "likes guns." Doc. No. 86-10 at 2. She called the basement room an "apartment," saying she had stayed there with Jimenez's brother until several months earlier, when Jimenez was released from prison and moved home. Id.

Meanwhile, other agents entered the enclosed first-floor porch and knocked on the door marked "21," breaching it when they received no immediate response. Doc. No. 94-1 at 5. Before agents breached the second door within the entry vestibule, Jimenez's father opened it. Doc. No. 94-2 at 4. Jimenez's parents and grandparents were present, and all were escorted by agents to the front porch. Id. Upon learning from Jimenez's mother that Jimenez's room was in the basement, agents breached the locked doors to that room. Id. They saw a Glock pistol with a high-capacity magazine and shoulder stock inside an open drawer to a nightstand beside the bed while clearing the room. Id. at 4, 7. They also noticed a military-style Kevlar vest hanging in a

7

closet, and a KelTec pistol on a couch.  Id. at 4–6.  Agents eventually seized these items, along with three types of ammunition and various other firearm accessories, all recovered inside Jimenez's room.  Doc. No. 94-1 at 7.

Once the property was cleared, and again after the search, an agent filmed videos walking through 21 Nesmith Street, including all rooms on the first floor and the basement.  The package containing the Glock Switches was found, unopened, on a table in the first-floor den.  Id. at 6.  While the warrant was executed, agents interviewed both of Jimenez's parents and his brother, who arrived while the search was underway.  Id. at 6, 8.

Jimenez's mother described the way the building was divided into two residences (21 and 23 Nesmith Street) with separate entrances, and she described who occupied each bedroom within 21 Nesmith Street.  Doc. No. 86-8 at 1–2.  She told agents that Jimenez occupied the basement room alone, typically entered and exited using the rear door, spent most of his time in the basement, but ate meals in the first-floor kitchen with his family.  Id. at 2.  According to her, everything in the basement belonged to Jimenez.  Id.  She referred to Jimenez's space in the basement as his "room," not as a separate apartment.  Doc. No. 86-14 at 21, 39, 44–45.  Jimenez's father echoed this information when agents interviewed him.  See Doc. No. 86-9.  Neither parent was aware that Jimenez possessed firearms.

D.  The Criminal Case

The day after the search, the government filed a sealed criminal complaint charging Jimenez with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), based on another affidavit by SA McCarthy.  Doc. No. 1.  An arrest warrant issued.  Doc. Nos. 5, 9.  In December 2019, a grand jury indicted Jimenez for two counts of that offense (one for each recovered firearm) and one count of illegally importing firearms (the Glock Switches) into the United States.  Doc. No. 6.  Nearly five years later, Jimenez was arrested in Georgia.  See Doc.

8

No. 14.  Counsel was appointed to represent him, but then he retained a lawyer.  Doc. Nos. 21, 24.  Though Jimenez eventually entered a guilty plea pursuant to an agreement negotiated by his retained lawyer, Doc. No. 61, he raised questions to the Court during what would have been his sentencing hearing about the lawfulness of the government's search and expressed dissatisfaction with his lawyer's representation, see Doc. No. 75.  And so, in March 2026, the Court reappointed his prior counsel.  Doc. No. 76.

Thereafter, in the unusual circumstances presented, the Court permitted Jimenez to withdraw his plea.  Doc. No. 83.  On May 29, 2026, he moved to suppress the evidence recovered during the search of 21 Nesmith Street.  Doc. No. 86.  After deadline extensions to which Jimenez assented, the government opposed the motion on July 8, 2026.  Doc. No. 95; see Doc. Nos. 87, 88, 91–94.  Jimenez timely replied.  Doc. No. 96.  As the Court has explained, it can and does resolve the motion on the papers.

## II.    LEGAL STANDARD

The "basic purpose" of the Fourth Amendment to the United States Constitution "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials."  Carpenter v. United States, 585 U.S. 296, 303 (2018) (quoting Camara v. Mun. Ct. of City & Cnty. of S.F., 387 U.S. 523, 528 (1967)); accord United States v. Mousli, 511 F.3d 7, 12 (1st Cir. 2007).  The Amendment's Warrant Clause requires the government to muster "proof sufficient to support a fair probability that a crime has been committed and that evidence of that crime is likely to be found within the [place or] objects searched."  United States v. Coombs, 857 F.3d 439, 446 (1st Cir. 2017).  It also "prohibits the issuance of any warrant except one 'particularly describing the place to be searched, and the persons or things to be seized.'"  Mousli, 511 F.3d at 12 (quoting U.S. Const. amend. IV).  This "particularity requirement . . .

9

limits the scope and intensity of the search" investigators may lawfully undertake pursuant to a warrant.  Id. (quoting United States v. Bonner, 808 F.2d 864, 867 (1st Cir. 1986)).

"By limiting the authorization to search to the specific areas . . . for which there is probable cause to search," the Amendment "ensures that the search will be carefully tailored to its justifications" and avoids "the wide-ranging exploratory searches the Framers intended to prohibit."  Maryland v. Garrison, 480 U.S. 79, 84 (1987).  This requirement is satisfied "if the description is such that the officer with a search warrant can, with reasonable effort[,] ascertain and identify the place intended."  Steele v. United States, 267 U.S. 498, 503 (1925).  The government must "specify the precise unit that is the subject of the search"; where a "multi-unit dwelling" is concerned, failure to specify the unit to be searched will generally render the warrant "invalid."  Mousli, 511 F.3d at 12 (citation modified).  "But search warrants are not always self-elucidating and . . . must be read in a practical, common-sense manner."  United States v. Fagan, 577 F.3d 10, 13 (1st Cir. 2009).  To that end, courts must apply "a real-world prism" and interpret search-warrant language "in a realistic fashion."  Id. (citation modified).

The "validity of a warrant must be assessed on the basis of the information that the [investigators] disclosed, or had a duty to discover and to disclose, to the issuing Magistrate."  Garrison, 480 U.S. at 85.  Facts discovered by investigators later, "demonstrating that a valid warrant was unnecessarily broad," will "not retroactively invalidate the warrant."  Id.  Similarly, when evaluating whether a warrant was executed in a reasonable manner, keeping within the bounds of the search authorized by the warrant's terms, courts must "allow some latitude for honest mistakes" and consider the officers' conduct through the lens of "the information available [to them] as the search proceeded."  Id. at 87.

III.   DISCUSSION

Jimenez advances three challenges to the search of 21 Nesmith Street.  He first claims the warrant was invalid because its description of the place to be searched did not satisfy the Fourth Amendment's particularity requirement.  Doc. No. 86 at 4–7.  Next, he argues the warrant did not authorize agents to search "the basement apartment" in which he resided.  Id. at 8–10. Finally, he contends the warrant application failed to supply probable cause that evidence of a crime would be located inside 21 Nesmith Street.  Id. at 10–11.  The Court will take Jimenez's challenges in turn and explain why each fails under the governing legal standards.

A.   Particularity

Jimenez begins by attacking the warrant's description of the premises to be searched, urging it was insufficiently specific considering the nature of the building at issue.  He relies on general principles applicable to multi-unit structures and characterizes the warrant as "purporting to allow the officers to search all four floors" of the building.  Id. at 6.  This objection wilts when evaluated through the "real-world prism" this Court is bound to apply.  Fagan, 577 F.3d at 13.

It is beyond dispute that 21 Nesmith Street is located within a multi-unit dwelling.  Both the warrant's description and photographs in the record make this apparent, and investigators were plainly aware of it.  If the warrant were reasonably read as authorizing a search of every unit throughout the whole building, then Jimenez's motion would likely present a clear-cut violation of the Warrant Clause's particularity requirement.  See Mousli, 511 F.3d at 12.  Such a result might very well arise if the warrant's description stopped after its first sentence, which describes "21 Nesmith Street, Lawrence, Massachusetts," as "a three-family, three-story dwelling (including attic), with vinyl siding, tan/beige in color with white trim and brown shutters."  Doc. No. 86-1 at 3.  But the description does not end there, nor can this Court's review.

11

The description of the premises continues for six more sentences and incorporates by reference two photographs. Those sentences and photographs make clear that the "three-family, three-story dwelling" is divided into at least two separate units, and that 21 Nesmith Street is only one of those units. See id. (describing two different numbers displayed on exterior of building). The units have different addresses (21 Nesmith Street, and 23 Nesmith Street) and are accessed from a shared porch using different front doors. Doc. No. 86-1 at 3–5. The first sentence, read in the context provided by the rest of the description, defines the premises as only that portion of the building designated 21 Nesmith Street. No reasonable officer exercising common sense would read the description and believe they could conduct a free-ranging search of the entire structure. Such an officer would understand that the search authorized by the warrant was limited to 21 Nesmith Street and did not extend to whatever parts of the building comprised 23 Nesmith Street.

The record shows that the agents executing the warrant were guided by this common-sense understanding. They knocked on the door marked "21," entered the unit to which it led, and limited their search to the areas occupants identified as falling within 21 Nesmith Street. They did not search 23 Nesmith Street, presumably because they knew they could not lawfully do so. The totality of the warrant's description was specific enough to convey that the agents could not rummage through areas that were not within 21 Nesmith Street. The Fourth Amendment required no more than that here.

Though the building is divided into at least two parts, the record does not support the notion that 21 Nesmith Street is itself a multi-unit dwelling, further subdivided into standalone units. Rather, the Court finds that 21 Nesmith Street is analogous to a two-story, single-family residence. This is how Jimenez's mother described the space to investigators, denying that it

contained separately numbered units and confirming that "21 Nesmith Street" spanned the first floor and the basement. Jimenez received mail at "21 Nesmith Street," without any reference to a separate unit by letter or number. He registered his address that way, without specifying a floor or apartment number, for various purposes, as evidenced by his phone bill, his driver's license, his car's registration, and his state-court probation records.

The layout of the home is also more consistent with a single dwelling than a location divided into two separate units. 21 Nesmith Street includes four bedrooms occupied by members of the same extended family. The residence features only one kitchen, located on the first floor, where Jimenez ate meals with the rest of his family. The main living space also includes two shared rooms on the first floor—a living room and a den, in which agents found the package addressed to Jimenez containing the Glock Switches. Thus, after accepting the package on Jimenez's behalf, Jimenez's mother apparently left it for him to retrieve in the living space of the home they shared. She did not deliver it to a separate mailbox or leave it outside the door of his locked room, as one might do when receiving mail for a neighbor living in a separate unit.

Nevertheless, Jimenez urges the Court to treat the locked room in the basement as a separate apartment or unit, distinct from the rest of 21 Nesmith Street, and to conclude that the warrant's failure to identify a subunit of that address rendered it invalid. He primarily relies on the locked doors to the room and the configuration of the space to include an area with a couch and minifridge. But the record does not support treating the space as an apartment that transforms 21 Nesmith Street into a multi-unit dwelling.

Though a locking door separates the first-floor rooms from the hallway leading to the basement staircase, there is no door at the bottom of those stairs to separate the basement from the stairs to the upper level—let alone a locking, exterior-style door marking the entry to a

13

distinct apartment. In Jimenez's view, his "apartment" is demarcated by the two locking doors to his room from the basement hallway. But the space behind those doors "was not equipped for independent living," and neither was the basement. United States v. Ferreras, 192 F.3d 5, 10–11 (1st Cir. 1999). The locked "unit" is basically one large room, with space enough for a sleeping area and an adjacent sitting or working area. It does not contain a bathroom or a kitchen. The video walkthrough of the basement suggests the locked room is heated only by a portable space heater, as no radiators, baseboards, vents, or other forms of heating commonly found in finished living spaces are visible, nor are any thermostat fixtures apparent on the walls of the room.

Even considering the basement as a whole (which, again, is not enclosed behind a door and is accessible to others for laundry), the bathroom across the hall from Jimenez's room does not render the space independent from the first floor. It lacks a kitchen or any other area equipped for preparing meals. Most of it is unfinished storage space. And Jimenez has offered no evidence that the basement had a dedicated mailbox, doorbell, utility meter, or any other similar characteristic commonly associated with a multi-unit dwelling.[3]

In these circumstances, Jimenez's particularity challenge fails. The warrant was sufficiently specific in describing the location to be searched—21 (and not 23) Nesmith Street—and that is precisely how the agents executing the warrant understood it. Cf. United States v. McLellan, 792 F.3d 200, 212–13 (1st Cir. 2015) (rejecting challenge to finding that location searched "was a single-family residence" rather than a multi-unit dwelling).

---

[3] Jimenez emphasizes that a woman agents encountered leaving the building—his brother's girlfriend, who lived at 23 Nesmith Street—referenced Jimenez's "apartment" in the basement. Doc. No. 86-10 at 2. But the agents were not bound by her use of that word, nor is the Court. For the reasons set forth in the text, the record objectively refutes her description.

14

B.    Execution

The foregoing analysis all but dooms Jimenez's next challenge.  He takes aim at the agents' execution of the warrant, contending it did not authorize a search of 21 Nesmith Street's basement—or, at least, his locked room located there.  Doc. No. 86 at 8–10.  As already explained, the facially valid warrant authorized the search of 21 Nesmith Street, which is used and occupied by Jimenez's family as a single-family residence.  The warrant authorized the search of the "entire dwelling," McLellan, 792 F.3d at 212, including any locked rooms and structures "appurtenant to" 21 Nesmith Street, Fagan, 577 F.3d at 13–14.  The record establishes that Jimenez's locked room and the rest of the basement were (at least) "appurtenant to" 21 Nesmith Street.  And the facts known to the agents at the time of the search permitted them to reach the same conclusion.

Jimenez emphasizes his reasonable expectation of privacy in the locked basement room. Doc. No. 86 at 8.  The government does not contend he lacked such an expectation, see Doc. No. 94, nor could it in the circumstances presented.  But Jimenez's expectation of privacy, however reasonable, does not change the fact that the warrant authorized the search of 21 Nesmith Street in its entirety, including his locked basement room.  For reasons the Court has already described, the basement of 21 Nesmith Street was not an independent unit for which a separate warrant was required.  This materially distinguishes the circumstances presented here from those the Court confronted in United States v. Holleran, a case Jimenez raised earlier in these proceedings and cites again in his motion papers.  See Doc. No. 83 at 3–4 (describing Jimenez's questions about Holleran during sentencing hearing before withdrawing plea); Doc. No. 86 at 8 (citing Holleran).

In Holleran, the defendant lived in the second-floor unit of a three-story building with an apartment on each floor, and a warrant authorized officers to search his unit.  No. 18-cv-10064-LTS, 2018 WL 6198955, at *3 (D. Mass. Nov. 28, 2018).  When executing the warrant, officers

15

also searched the building's unfinished basement, which they entered via a closed door bearing two locks that were "in the unlocked position" at the time. Id. The basement was not within the premises described in the warrant, its door was shut and was generally kept locked, and the record contained evidence establishing the defendant's expectation of privacy in containers he kept in the basement with the permission of the building's owner. Id. at *7. Because the officers lacked a warrant authorizing the search of the basement, the Court found the seizure of the defendant's property stored there "violated his Fourth Amendment rights." Id. Here, the basement was not segregated from the stairs and the upper floors by its own locking door. The finished portion of it was used by the occupants of 21 Nesmith Street (i.e., Jimenez's family) as an extension of the living space that made up their home, not as an independent, fully equipped unit distinct from the rest of the residence.

Unlike in Holleran, the warrant at issue, by its terms, authorized a search that extended to all areas of 21 Nesmith Street. See McLellan, 792 F.3d at 212 (explaining warrant for "single-unit residence" permits "search of that entire dwelling regardless of who the area being searched belongs to"). No Fourth Amendment violation arose from the agents' search of Jimenez's bedroom or any other portion of 21 Nesmith Street's basement.[4]

C.    Probable Cause

In his last challenge, Jimenez suggests that investigators lacked probable cause for a search of his home "because no illegal item had been delivered to the house" yet. Doc. No. 86 at 10. However, as Jimenez concedes, a search warrant application turns on "probabilities," which "are the factual and practical considerations of everyday life on which reasonable and prudent

---

[4] Given its findings that the warrant was sufficiently specific and that agents acted reasonably in executing it, the Court need not assess the parties' competing arguments concerning application of the good-faith exception. See Doc. No. 94 at 6–9 (citing exception as alternative basis to reject Jimenez's challenges); Doc. No. 96 (responding to government's invocation of exception).

men, not legal technicians, act." Id. (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). Though probable cause demands "more than bare suspicion," it does not require the same showing that "would justify condemnation or conviction." Brinegar, 338 U.S. at 175.

Here, SA McCarthy described "facts and circumstances within [his] knowledge" that sufficed "to warrant a man of reasonable caution in the belief that an offense ha[d] been or [wa]s being committed," and that evidence of the crime would be found inside 21 Nesmith Street. Id. at 175–76. As the government highlights in its opposition, and as the warrant application described, investigators were aware that Jimenez's criminal record precluded him from lawfully possessing a firearm. See Doc. No. 94 at 10 (discussing prior convictions and 18 U.S.C. § 922(g)(1)); Doc. No. 86-1 at 13–15, 20 (same). He had nevertheless ordered at least three gun-related accessories in June 2019, for delivery to him at 21 Nesmith Street—a stock, a holster, and switches that would convert a handgun into a machinegun's equivalent. These facts would cause a reasonable person, applying common sense, to conclude that Jimenez likely (and illegally) possessed a firearm.

Jimenez suggests "common sense" also dictates "that the purchase of an accessory does not establish ownership or storage of the related items." Doc. No. 86 at 10–11. Fair enough. But this proposition means little divorced from the applicable standard of proof. Were the government endeavoring to prove Jimenez guilty of violating § 922(g)(1), beyond a reasonable doubt, based only on evidence that he ordered a holster and a Glock Stock, it would likely fail. But in seeking a search warrant, the government faced a substantially lower burden. Probable cause is not undermined simply because Jimenez can conceive of another reason why a person in his position might have ordered firearms accessories—especially where the reason he offers is rendered implausible by other facts in the record. Compare Doc. No. 86 at 11 (positing that "a

17

reasonable person would conclude that Mr. Jimenez was purchasing firearm accessories as a gift, likely for his brother" who was licensed to possess firearms), with Doc. No. 86-1 at 17 (attesting that Jimenez's brother owned two pistols that were not compatible with Glock accessories).

Put simply, Jimenez's last challenge fares no better than his others. His criminal record, his trio of recent firearm-accessory purchases, and SA McCarthy's experience regarding such accessories and where people typically store their firearms, combined to supply the requisite probable cause for a warrant to search 21 Nesmith Street.

IV.    CONCLUSION & ORDER

Because Jimenez's challenges to the warrant and the resulting search fail, his motion to suppress (Doc. No. 86) is DENIED. The Court will hold a status conference on July 30, 2026, at 10:30 AM. The government shall be prepared to address any period of unexcluded time arising since the Court's last order on excludable delay (Doc. No. 77) that it seeks to exclude.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

18